*apolis Iron Store Co. v. Branum,* 36 N.D. 355, 162 N.W. 543, 552 (N.D.1917).

The disputed issue under the common law in North Dakota was whether a landlord, to maintain an interest in the crop *over and above his share* for securing payment from the tenant for monies advanced by the landlord, was required to file that agreement to protect himself against creditors of the tenant. The North Dakota Supreme Court indicated in *Minneapolis Iron Store, supra,* that the landlord was required to file such agreements. However, four years later in *Merchants' State Bank, supra,* the North Dakota Supreme Court clarified the result in *Minneapolis Iron Store* and specifically held that it was not necessary to file an agreement between the landlord and the tenant under which a landlord retained an interest in the crop over and above his share to be effective against subsequent purchasers or incumbrancers claiming under the tenant.

It was the *Merchants' State Bank* case that the North Dakota Legislature addressed in section 47-16-03. It changed the law with respect to agreements under which the landlord retained an interest in the tenant's share of the crop. It required such agreements to be filed to prevail against creditors of a tenant. It did nothing, however, to change the North Dakota common law with respect to the rights of the landlord to his share of the crop. By its specific terms, section 47-16-03 is applicable only to those situations in which a landlord retains title to all or a part of the crops *"until conditions of the lease have been complied with* by the lessee and a division of the crops is made."  N.D.Cent. Code § 47-16-03.

"Every word, clause, and sentence used in the statute is to be given effect." *Garner Public School District No. 10 v. Golden Valley County Committee for Reorganization of School Districts,* 334 N.W.2d 665, 670 (N.D.1983). To hold as the majority has that section 47-16-03 applies to a simple "cropping contract" renders the phrase "until the conditions of the lease

have been complied with" obsolete.  N.D. Cent.Code § 47-16-03.

In my view, this Court is upsetting North Dakota law as it is commonly understood, and is applied to simple cropping agreements. It will force North Dakota landowners to file cropping agreements with the register of deeds in the county in which the land is located to protect their interest in the crop. I find nothing in the legislation to indicate that the North Dakota Legislature intended this dramatic reversal of the common law.

**James K. DUDLEY, Appellee,**

v.

**Thomas H. DITTMER and Refco, Inc., f/k/a Ray E. Friedman & Company, Appellants.**

**Nos. 85-2097, 85-2153.**

United States Court of Appeals, Eighth Circuit.

Submitted March 10, 1986.

Decided July 16, 1986.

**670**

Elizabeth J. Robben, Little Rock, Ark., for appellants.

Martin J. Elgison, Atlanta, Ga., for appellee.

Before JOHN R. GIBSON and WOLLMAN, Circuit Judges, and HARPER,* Senior District Judge.

JOHN R. GIBSON, Circuit Judge.

Refco, Inc., a commodities brokerage business, and its president, Thomas H. Dittmer, appeal from a general verdict against them awarding James K. Dudley, a Refco broker, $153,525 on his claims of fraud under section 4b, and market manipulation under section 9(b), of the Commodities Exchange Act (CEA), 7 U.S.C. §§ 6b, 13(b) (1982). Refco and Dittmer argue principally that the evidence was insufficient to support the verdict on either theory of recovery. Dittmer also individually contests the trial court's assertion of personal jurisdiction over him. We conclude that the court has jurisdiction over Dittmer. However, based on *Horn v. Ray E. Friedman & Co.*, 776 F.2d 777 (8th Cir.1985), decided by this court after Dudley's case was tried, and involving a fraud claim brought by another Refco trader arising out of precisely the same alleged misconduct, we are constrained to conclude that the evidence was insufficient for a reasonable jury to find for Dudley on his claim of fraud and must order that judgment be entered for Refco and Dittmer on this issue. Because we are unable to determine from the general verdict the extent to which the jury judgment and award rested on the improperly submitted fraud theory, we vacate the general verdict and remand the case for a new trial on the market manipulation claim.

James K. Dudley is one of several traders with Refco's Springdale, Arkansas office to bring suit against Refco and Dittmer to recover losses suffered in personal trading accounts during October and No-

---

* The HONORABLE ROY W. HARPER, Senior United States District Judge for the Eastern and Western Districts of Missouri, sitting by designation.

vember 1979. *See Greenwood v. Dittmer,* 776 F.2d 785 (8th Cir.1985); *Horn v. Ray E. Friedman & Co.,* 776 F.2d 777; *Bone v. Refco, Inc.,* 774 F.2d 235 (8th Cir.1985). Dudley began work as a commodities chart analyst in August 1977, and after the required minimum one year apprenticeship, was licensed to broker commodities in November 1978. Shortly thereafter, from February 1979 to February 1980, Dudley worked as a commodities broker in Refco's Springdale office, trading both for customers accounts and on his personal account. During August 1979 Dudley was trading live cattle futures on the Chicago Mercantile Exchange (CME) primarily from the short side, but beginning later that month and through October 2 he primarily traded long.

Dudley alleges that he took the long positions in reliance on fraudulent misrepresentations by Dittmer which, he further alleges, Dittmer issued as part of a scheme to manipulate the market for live cattle futures. According to Dudley, during August and September 1979, Dittmer disseminated various fraudulent misrepresentations designed to encourage traders with Refco's Springdale office to purchase long on live cattle contracts. Dudley asserts that through these misrepresentations, Dittmer was able to drive up the cattle futures market and trade the rising market from the long side, to close out his long positions at a substantial profit when the price artificially peaked, then trade from the short side before the artificially high price dropped, to close out his short positions at a substantial profit when the price collapsed. Dudley alleges that through this scheme, Dittmer gained over $1,000,-000 in profits. He also alleges that the long positions he established during this period ultimately resulted in a personal loss of $307,050.

Dittmer's alleged fraudulent misrepresentations, through which he allegedly was able to manipulate the market, and upon which Dudley testified he relied to establish long positions, reached Dudley in two ways. Dudley testified that on August 27, Dittmer telephoned Robert Bone, a broker with and the de facto manager of Refco's Springdale office, and Dudley's brother-in-law. The evidence showed that Dittmer knew that other brokers customarily listened to their conversations on the extension telephones. Dudley testified that Dittmer told Bone and others listening, Dudley among them, that his cattle feedlots were low, indicating that the price of October and December live cattle contracts would rise, and urged the Refco brokers to take long positions in those contracts and to advise their customers to do the same. According to Dudley, throughout September, Dittmer's urgings became more frequent and forceful. Dudley asserts that Dittmer's statement that his feedlots were low constitutes a misrepresentation of fact, in that Dittmer, in a hedge application made to the CME on October 5, admitted into evidence, stated that his feedlots were "at capacity." The evidence also established that on the morning of October 2, Dittmer told Ed Apel, a trader on the CME, that the correct position in the cattle futures market was the long position. Later that day, Apel, who as the evidence showed Dittmer knew usually spoke with Bone and others in the Refco Springdale office ten to twenty times a day, communicated Dittmer's recommendation to Bone. Dudley testified that he overheard this conversation. Bone also passed on Dittmer's recommendation to the other Springdale brokers. Documentary evidence established that on October 2, as Dudley and other brokers, purportedly relying on Dittmer's advice, were adding to their long positions, Dittmer sold his long contracts and purchased short. By the end of the day, the market had collapsed and Dudley sustained substantial losses on his long contracts. Dittmer, however, having reversed his position as the market peaked, reaped substantial profits from the market's precipitous fall.

Dudley brought suit against Refco and Dittmer claiming fraud and market manipulation under sections 4b and 9(b) of the CEA, respectively. The jury, not having been charged to return separate verdicts under each theory, returned a general ver-

dict in favor of Dudley. Refco moved for judgment notwithstanding the verdict. The motion was denied, and this appeal followed.

## I.

■ Dittmer, not an Arkansas resident, charges that the trial court was without personal jurisdiction over him. The Arkansas long-arm statute allows a court in Arkansas to exercise jurisdiction over a person as to a cause of action arising from that person's "transacting any business in this state." Ark.Stat.Ann. § 27–2502(C)(1)(a) (Repl.1979). The Arkansas Supreme Court has held that the statute extends Arkansas' jurisdiction over nonresidents to the limits permitted by the due process clause of the United States Constitution. *SD Leasing, Inc. v. Al Spain & Associates, Inc.*, 277 Ark. 178, 180, 640 S.W.2d 451, 452 (1982); *Nix v. Dunavant*, 249 Ark. 641, 643, 460 S.W.2d 762, 763 (1970). We therefore consider whether the district court's assertion of jurisdiction over Dittmer violates due process.

In *International Shoe Co. v. Washington*, 326 U.S. 310, 66 S.Ct. 154, 90 L.Ed. 95 (1945), the Supreme Court explained that due process permits the exercise of personal jurisdiction over a nonresident defendant only when the nonresident purposefully establishes such "minimum contacts" with the forum state, *id.* at 316, 66 S.Ct. at 158, that maintenance of the suit would not offend "our traditional notions of fair play and substantial justice." *Id.* at 320, 66 S.Ct. at 160. When the nonresident deliberately establishes "continuing relationships and obligations with citizens of another state," *Travelers Health Association v. Virginia*, 339 U.S. 643, 647, 70 S.Ct. 927, 929, 94 L.Ed. 1154 (1950), or "purposefully direct[s]" its activities at residents of the forum state, *Keeton v. Hustler Magazine, Inc.*, 465 U.S. 770, 774, 104 S.Ct. 1473, 1478, 79 L.Ed.2d 790 (1984), and the litigation results from alleged injuries that "arise out of or relate to those activities," *Helicopteros Nacionales de Colombia, S.A., v. Hall*, 466 U.S. 408, 414, 104 S.Ct.

1868, 1872, 80 L.Ed.2d 404 (1984), the Court has reasoned that it would not be unfair to compel a nonresident to assume the burdens of litigation in the forum state. Specifically, among contacts held sufficient in various combinations to justify the forum state's assertion of jurisdiction over a nonresident, are the nonresident's telephone calls into the forum state, *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 105 S.Ct. 2174, 2184, 85 L.Ed.2d 528 (1985), physical presence for business purposes in the forum state, *Perkins v. Benguet Mining Co.*, 342 U.S. 437, 444–45, 72 S.Ct. 413, 417–18, 96 L.Ed. 485 (1952), or receipt of substantial profits from commerce with its residents, *McGee v. International Life Insurance Co.*, 355 U.S. 220, 78 S.Ct. 199, 2 L.Ed.2d 223 (1957).

The evidence is undisputed that Dittmer made numerous telephone calls to the Refco office in Springdale in August and September of 1979. Further, it is undisputed that before the transactions of 1979, Dittmer paid two visits to Arkansas to meet with brokers in the Springdale office. Although Dittmer argues that he telephoned and visited in his capacity as president of Refco, rather than to transact personal business, the evidence is clear that he, like the Refco brokers, traded both on customer accounts and personal accounts. Indeed, Dudley alleges that as a result of communications with the Springdale office, Dittmer personally derived substantial profits. Based on these contacts, and more generally, on Dittmer's purposeful direction of activities at, and establishment of continuing relationships with, Arkansas residents, out of which this litigation arises, we do not believe it is unfair to require Dittmer to defend this suit in Arkansas. Therefore, we conclude that the district court properly asserted personal jurisdiction over Dittmer.

## II.

■ Refco and Dittmer contend that there was insufficient evidence to submit Dudley's claim of fraud under section 4b of the CEA to the jury. An action for fraud under the CEA requires a false representa-

tion of material fact with knowledge and belief by the defendant that the representation is false, and an intent to induce reliance on the representation. *See Greenwood v. Dittmer*, 776 F.2d at 789. They argue that none of Dittmer's alleged statements to the brokers were false, or believed to be false when made.

■ Dudley responds that the evidence was sufficient to establish fraud, and points to two allegedly knowing misrepresentations made by Dittmer. First, throughout August and September, when Dittmer allegedly was urging the brokers to buy long and to advise their customers also to buy long, Dittmer stated that the supply in his cattle feedlots was low. Dudley argues that these were knowing misrepresentations, since in the hedge application filed with the CME on October 5, Dittmer declared that his feedlots were "at capacity." Second, on the morning of October 2, Dittmer told Apel that he expected the price of October and December cattle futures contracts to rise. Dittmer's fraudulent intent is demonstrated, Dudley contends, by Dittmer's unloading his long contracts and buying short contracts on that same day.

In *Horn v. Ray E. Friedman & Co.*, 776 F.2d 777, the plaintiff, also a broker in the Refco Springdale office, but licensed since 1971, asserted a claim of fraud under section 4b of the CEA arising out of precisely the same alleged misrepresentations. The court held that the evidence was insufficient to support the jury verdict that Refco and Dittmer had committed fraud under section 4b of the CEA. As to the conflict between Dittmer's statements in August and September regarding the supply in his cattle feedlots, and his hedge application of October 5, the court reasoned that the passage of time may have made both statements true, and that Horn had made no showing to the contrary. *Id.* at 780. As to the discrepancy between Dittmer's statement to Apel on the morning of October 2, and his trading activity later that day, the court observed that "[i]n view of the volatile nature of commodities futures markets,

Dittmer's opinion concerning the market could very easily have changed shortly thereafter." *Id.* at 781.

■ *Horn* was decided after the trial in this case and the district court was without the benefit of its holding when it denied defendants' motion for judgment notwithstanding the verdict. Nevertheless, the fraud case presented to the jury in *Horn* is virtually identical to the case before us. Indeed, Dudley's counsel at oral argument conceded that the trial records of the two cases cannot genuinely be distinguished. A decision of a panel of this court is the law of the circuit and we are compelled to follow it. *United States v. Norton*, 780 F.2d 21, 23 (8th Cir.1985); *United States v. Lewellyn*, 723 F.2d 615, 616 (8th Cir.1983); *United States v. Howard*, 706 F.2d 267, 269 (8th Cir.), *cert. denied*, 464 U.S. 934, 104 S.Ct. 341, 78 L.Ed.2d 309 (1983). Thus, while we believe that the opinion in *Horn* draws some close distinctions, and that we might, given a fresh slate, reach a different conclusion as to submissibility, the *stare decisis* rule of this circuit requires that we follow *Horn*. We therefore must conclude that the trial court erred in denying defendant's motion for judgment notwithstanding the verdict, and order that judgment be entered on the fraud claim against Dudley.

### III.

■ The trial court submitted the case to the jury on both a fraud and a manipulation theory, and instructed that a general verdict be rendered. The jury returned a general verdict for Dudley of $153,525. Because the jury returned a general verdict, however, we are unable to determine the extent to which the jury judgment rested on the improperly submitted fraud theory, or whether the jury would have granted the same award had the case been submitted on the market manipulation theory alone. The rule in this circuit is clear that when one of two theories has erroneously been submitted to the jury, a general verdict cannot stand. *Bone v. Refco, Inc.*, 774 F.2d at 242; *Slater v. KFC Corp.*, 621 F.2d 932, 939 (8th Cir.1980); *E.I. du Pont de*

*Nemours & Co. v. Berkley & Co.*, 620 F.2d 1247, 1257 (8th Cir.1980); *Mueller v. Hubbard Milling Co.*, 573 F.2d 1029, 1038–39 (8th Cir.), *cert. denied*, 439 U.S. 865, 99 S.Ct. 189, 58 L.Ed.2d 174 (1978); *Patton v. Wells*, 121 F. 337, 340 (8th Cir.1903). *See also Sunkist Growers, Inc. v. Winckler & Smith Citrus Products Co.*, 370 U.S. 19, 29–30, 82 S.Ct. 1130, 1135–36, 8 L.Ed.2d 305 (1962); *United New York & New Jersey Sandy Hook Pilot Association v. Halecki*, 358 U.S. 613, 619, 79 S.Ct. 517, 520, 3 L.Ed.2d 541 (1959); *Maryland v. Baldwin*, 112 U.S. 490, 493, 5 S.Ct. 278, 279–80, 28 L.Ed. 822 (1884). Accordingly, we must reverse the general verdict, and remand the case for a new trial on the market manipulation claim under section 9(b) of the CEA.

Because we remand this case for a new trial, we need not address defendants' challenges to the trial court's jury instructions or evidentiary rulings, nor need we review plaintiff's challenge to the district court's refusal to award pre-judgment interest. We further believe it prudent, since the record on retrial may differ from that before us now, to refrain from evaluating the sufficiency of the evidence presented on market manipulation. We do observe, however, that *Horn* dealt with the issue of fraud and did not decide sufficiency of the evidence under the theory of market manipulation. Thus, the discussion in *Horn* on this issue, 776 F.2d at 781, does not bind the district court on retrial.

We reverse the general verdict, order that judgment be entered in favor of Refco and Dittmer on the fraud claim, and remand for retrial of the market manipulation claim.